THE RUTLAND AND BURLINGTON RAILROAD COMPANY v. REU-
BEN R. THRALL.

*Corporation. Directors. Pleading. Railroads. Charter. Evi-
dence. Exceptions. Supreme Court. Forfeiture of Stock for
non-payment of Assessments.*

The plaintiff's charter required that ten thousand shares of stock should be
subscribed before any assessments should be made. That number of shares
was subscribed for, but the subscription contained a condition that interest
should be paid by the corporation on all sums assessed and paid in, from
the time of payment until the railroad should be put in operation. *Held,*
that this condition was not a violation of the above-mentioned requirement
of the charter.

The plaintiffs' charter provided that the directors might require payment of
the sums subscribed to the capital stock, at such times, and in such propor-
tions, as they should deem best. The subscription provided that the direct-
ors might, after the requisite number of shares was subscribed for, proceed
to make assessments thereon for the purposes authorized by the charter, but
that no assessment should exceed ten dollars on a share. The directors
passed a vote that sixteen assessments of five dollars each be laid on the
capital stock, to be called for by the treasurer at such times as the executive
committee should direct. This executive committee was composed of four
directors appointed by the board. In an action to recover these assessments
upon the defendant's subscription, the declaration set forth the laying of
these assessments, and alleged that the executive committee called for their
payment at certain specified times. *Held,* that neither the charter nor the
subscription prevented the directors from laying several assessments, not
exceeding ten dollars each, by one vote; that the ratification by the direct-
ors of the acts of the executive committee in fixing the time for the payment
of, and calling for, the several assessments so voted, made such acts
the acts of the directors within the provisions of the charter and sub-
scription.

*Held,* also, that the declaration should allege that the time of payment of the
assessments was fixed by the directors, and the call therefor issued by them,
instead of by the executive committee.

After the defendant's subscription and the organization of the corporation, the
legislature authorized them to extend their railroad beyond its original pre-
scribed limits, and the corporation accepted such addition to their charter
without the defendants' consent. But another stockholder resisted the pro-
jected extension of the road, and the court of chancery enjoined the plain-
tiffs from proceeding under the new act, and they thereupon abandoned all
action thereunder. *Held,* that this furnished no ground of defence to the
defendant against his stock subscription.

R. & B. R. R. Co. *v.* Thrall.

The legislature also, after the plaintiffs' organization, authorized them to issue preferred stock at a guaranteed rate of interest, which addition to their charter was accepted without the defendant's consent, and the preferred stock issued accordingly. *Held,* that this was a legitimate mode of raising money, and did not release the defendant from liability on his stock subscription.

The plaintiffs' charter required that the directors should give notice of the assessments on the capital stock, and the time and place of payment thereof, in certain newspapers. *Held,* in the absence of any proof of a fair and diligent search for, and inability to find, such newspapers, in places where they would be likely to be, within the vicinity of the party, and reasonably accessible, that the testimony of a witness who stated that he had examined such newspapers, and that the notice was published therein as required by the charter, and also stated the contents of the notice, was incompetent.

*It seems,* that where proof of the successive publication of a notice in a newspaper is required, it is sufficient to produce one paper and show the contents, and then prove by parol that there were the requisite successive publications of the same notice. ALDIS, J.

The defendant, by his subscription to the plaintiffs' capital stock, promised to pay the several assessments thereon as they should from time to time be ordered, according to the act of incorporation. The act of incorporation provided that the directors should give notice of the several assessments, and of the time and place of their payment, in certain newspapers. *Held,* that it was a condition of the defendant's liability that such notice should be given as required by the charter, but that such condition might be waived by the defendant.

*Held* that, in this case, no such waiver was proved.

When an exception appears in terms to have been taken in the county court, it is to be regarded as rightly before the supreme court, unless other parts of the bill of exceptions show to the reasonable satisfaction of the court, that it was not passed upon by the county court.

Before the passage of any statute relating to forfeiture of stock in a railroad company by reason of non-payment of assessments, and when the only legislative provision in reference to the matter in question was contained in the plaintiffs' charter, in the following words: "the directors may require payment of the sums subscribed to the capital stock at such times, and in such proportions, and on such conditions, as they shall deem best, *under the penalty of forfeiture of all previous payments thereon.*" *Held,* that the proceeding by forfeiture was cumulative, and coexisted with the right to sue for the assessments; that in declaring a forfeiture of stock the plaintiffs must adopt a course of proceeding reasonable and just to the stockholder; that it was not necessary that the notice of the conditions on which the

stock would be forfeited, should be issued when the calls for the assessments were made; that a declaration of forfeiture, made August 15th, of all stock on which assessments should remain unpaid September 20th following, and requiring immediate notice of such declaration to be given to all delinquents, was reasonable; that under such a declaration a sale of the stock was not necessary to complete the forfeiture; that a stockholder whose stock had been thus forfeited, was thereby released from any further liability upon his subscription; and that the forfeiture would not take place unless the corporation gave reasonable notice to the delinquent stockholder that his stock would be forfeited unless by a specified time the overdue assessments were paid.

ASSUMPSIT to recover certain unpaid assessments upon the defendant's subscription for twenty shares of the capital stock of the plaintiff's corporation, then known by the name of the Champlain and Connecticut River Railroad Company. Plea, the general issue, and trial by jury, at the September Term, 1860, PIERPOINT, J., presiding.

The plaintiffs proved their incorporation and organization, and also the subscription of the defendant for twenty shares of the capital stock, as set forth in the declaration. By this subscription the defendant and the other signers severally agreed to take the number of shares affixed to their names, and to pay the several assessments thereon as they should from time to time be ordered, according to the act of incorporation, upon four conditions therein recited, the only ones of which, material to be reported, are the second and fourth, which were respectively as follows:

*Second,* That as soon as ten thousand shares shall have been subscribed, the directors may proceed to make assessments on the shares subscribed, for the purposes authorized by the charter; but no more than fifty dollars on a share shall be assessed and made payable within one year from the time when the first assessment shall be laid or ordered; and no assessment shall exceed ten dollars on a share.

*Fourth,* That interest shall be allowed and paid by the corporation on all sums assessed and paid in, from the time of payment until the railroad shall be put in operation; and any and every subscriber shall have the privilege of paying in, at any time during one year from the time when the first assessment

shall be made payable, fifty dollars on each share by him subscribed, and at any time during the second year thereafter the remainder thereof; and shall in such case receive interest thereon from the time of payment until the railroad shall be put in operation; and said payments shall be received in discharge of assessments to the amount thereof.

The plaintiffs gave evidence tending to prove that ten thousand shares of stock were subscribed for before any assessments were made thereon.

The plaintiffs put in evidence their corporation records, showing the votes of the directors, laying the various assessments sued for. One of these votes was passed June 4th, 1847, as follows:

*Resolved,* That sixteen assessments of five dollars each be laid on the shares of the capital stock of this corporation, to be called for by the treasurer at such times as the executive committee shall direct.

The plaintiffs also proved that the directors on the 13th January, 1847, appointed four of their number an "executive committee," and that such committee, under the authority of the above vote of the directors of June 4th, 1847, from time to time directed the treasurer of the corporation to call for the several assessments upon the stock, contemplated by such vote. These directions to the treasurer were in writing, signed by the several members of the executive committee, or a majority of them, and directed him to duly advertise for such assessment respectively, naming in such direction the times when such assessments were to be paid, but no place of payment was mentioned.

The only provision of the plaintiffs' charter material to be reported here, was the 17th section, which was as follows:

"The directors may require payment of the sums subscribed to the capital stock, at such times, and in such proportions, and on such conditions, as they shall deem best, under the penalty of forfeiture of all previous payments thereon; and shall give notice of the payments required, the time and place where the same is to be paid, at least thirty days previous thereto, in a newspaper published in each of the counties through which such road passes."

The plaintiffs introduced the deposition of Samuel Swift, who was the plaintiffs' treasurer during the whole time that the several assessments sought to be recovered were laid, the purpose of which was, among other things, to prove that notice of these various assessments was given in accordance with the 17th section of the plaintiffs' charter.

In respect to this point the deponent stated that he had examined certain newspapers printed in each of the several counties through which the plaintiffs' railroad passed, and that he knew that the notices of the assessments in question were published in them as required by the charter. The deponent then stated the contents of the notices, but did not annex to his deposition the newspapers which contained them, nor were they produced on trial. The statement of the contents of these notices, as given by the deponent, did not show that they specified any *place* of payment of the assessments. To the admission of this deposition the defendant objected, but the court overruled the objection, and admitted the deposition, to which the defendant excepted.

The plaintiffs called Charles Linsley as a witness, who testified that he was appointed by the directors a committee to collect the subscriptions; that he called on the defendant for that purpose, and that he said he would pay as soon as he could; but the witness could not fix the time when he so applied to the defendant, and could not say whether it was before or after this suit was commenced.

It was also proved that the construction of the plaintiffs' railroad was commenced in the winter of 1846–7, and that the road was opened December 18th, 1849; and that interest had been allowed and paid back to the stockholders agreeably to the fourth condition of the plaintiffs' subscription.

The defendant offered to prove that the plaintiffs, without his consent, applied to the legislature and procured the passage of an act, being No. 98 of the acts of 1850, authorizing the extension of the railroad from Burlington, its original northern terminus, to Swanton, and by vote of February 6th, 1851, accepted the same, and expended their money and the labor of their servants in obtaining such extension of their charter, and in surveying the extension of their road under said act; but it being

admitted that any further expenditure of their funds in the prosecution of such extension was stayed by an injunction from chancery, on the petition of a stockholder, and that such injunction now stands, and said writ is now pending, and that nothing has since been done under said act, the court rejected the evidence offered, and to such rejection the defendant excepted.

The defendant also offered a vote in stockholders' meeting of February 6, 1851, accepting as part of the plaintiffs' charter, an act approved November 9th, 1850, authorizing the issue of stock, guaranteeing a certain dividend, and offered to prove that said corporation had thereunder issued certain six per cent. and certain eight per cent. preferred stock, which was preferred in behalf of the subscribers thereto to all other stock of said corporation in the declaring and payment of dividends ; and that certain dividends had been declared and paid upon such preferred stock, to the subscribers thereto, and none to the original subscribers ; all without his consent.  The court excluded this evidence, and the defendant excepted.

The defendant also offered in evidence three resolutions passed August 15th, 1849. relative to the forfeiture of stock, with evidence that such stock was then worth $60 per share in market ; but it was not claimed that the defendants' stock had ever been sold by the corporation.  Excluded.  To this exclusion the defendant excepted.  These resolutions were as follows :

" *Whereas*, sundry persons in whose name the stock of this corporation stands, are delinquent in the payment of assessments ordered thereon ; and whereas, at the meeting of stockholders on the 20th day of June last, the following resolution was adopted, viz :

" *Resolved*, That the directors be, and they are hereby, requested to take prompt and efficient measures for the collection of unpaid assessments upon the capital stock of this corporation, and so far as they think expedient, to sell all such shares as are not paid before the 1st of August next."

Now be it

*Resolved*, That all stock on which the assessments shall remain unpaid on the 20th day of September next, shall be, and hereby is, forfeited to the use of this corporation.

*Resolved,* That the treasurer be, and he hereby is, directed to issue a circular giving immediate notice of the above vote to all delinquent stockholders, and that all stock forfeited to the corporation, by virtue of the foregoing resolutions, be brought to a public sale under the direction of the treasurer, and sold on account of the delinquent stockholders, at such times and places as he shall think expedient ; and for any deficiency that may remain unpaid on assessments after such sale, the treasurer is hereby directed to enforce the collection by a suit at law.

*Resolved,* That the minimum price of the stock be fixed at seventy cents, and that if sold by the treasurer for non-payment of assessments under seventy cents, it shall be bought in for the corporation."

The evidence being closed, the defendant asked the court to instruct the jury that upon the evidence the plaintiff was not entitled to recover ; that there was no evidence of notice having been given of the time and place of payment of assessments, as required by the charter. But the court refused so to charge, and submitted the case to the jury, with instructions in relation to the vote of June 4th, 1847, and the action of the executive committee thereunder, that it was competent for the directors then to lay assessments to the full amount of the balance of the subscriptions, and leave the time of payment to be fixed by the executive committee ; and that if the said committee did fix the time of payments at the times that the plaintiffs' evidence tended to show, it was the same thing in effect, if so done, as if the directors had fixed the time themselves, and the assessments would not be invalid. The court further instructed the jury that if they did not find that ten thousand shares of the plaintiffs' stock was subscribed for before the making of the assessments, their verdict should be for the defendant.

The jury returned a verdict for the plaintiff, for the full amount of the defendant's subscription, and interest from December 18th, 1849, deducting the admitted payments, it being conceded that the 18th of December, 1849, was the proper time from which to cast interest.

After verdict the defendant moved in arrest of judgment for the insufficiency of the declaration. The only part of the dec-

laration material to be noticed in reference to this motion in arrest is that in which it was alleged, after stating the vote of the directors on the 4th of June, 1847, laying sixteen assessments of five dollars each, to be called for by the treasurer at such times as the executive committee should direct, that " the said executive committee, being members of the said board of directors, did direct, and said treasurer did call for, the payment of said sixteen assessments for the use of said company as follows, to wit," specifying the several times of payment fixed by the executive committee.

The county court, *pro forma*, overruled this motion in arrest, to which the defendant excepted.

*Daniel Roberts*, for the defendant.

*S. H. Hodges* and *E. J. Phelps*, for the plaintiffs.

ALDIS, J.   I.   The first point made by the defendant is that the subscription is void on account of the fourth condition contained in it, which provides that " interest shall be allowed and paid by the company on all sums assessed and paid, from the time of payment until the railroad shall be put in operation." It is claimed that this condition is in substance an agreement by the company to pay back to the subscribers a part of the capital stock required by the charter, and therefore that the amount required in order to organize the company was not in fact subscribed ; that the charter requires a million of dollars, and that by this arrangement the amount subscribed was only a million, minus the interest to be paid back.   We deem this point untenable.

I.   No time is fixed for the payment of the interest.   Upon a similar proviso in *Waterman* v. *Troy and Greenfield Railroad*, 20 Law R. 351, cited in Redfield on Railways, p. 100, it was held that the agreement did not bind the company to pay interest before the road went into operation.   The whole amount subscribed might be expended in constructing the road, and the interest be paid out of the earnings, after it went into operation. Upon a capital of a million thus invested, the company might

borrow money to pay this interest before the road went into operation, charging the future earnings with the payment of the debt.

The condition is just as among the subscribers—those who pay early not losing their interest, and those who pay late not gaining the use of their money by withholding it.

Its practical operation would be beneficial to the company by securing the prompt payment of assessments. We think the condition has been very generally adopted in subscriptions to railways, and that it has never been deemed a reduction of the stock below the amount subscribed.

The cases cited from 6 Cush. and 18 Barb. are not in point. They only go to the general principle that a subscription to be paid in property of less value than the amount subscribed is not a subscription in money to the amount subscribed. Here the whole amount subscribed is actually paid in money. See 12 Barb. 156.

II. It is claimed that the assessments as made by the executive committee of the directors, and addressed to the clerk or treasurer, do not specify a *place* of payment. The 17th section of the company's charter does not require it. It provides only that the directors " shall give notice of the payments required, the time and place where the same is to be paid, at least thirty days previous thereto, in a newspaper published in each of the counties through which the road passes." See 2 Vt. 293, as to notice of a demand of payment.

III. That the assessments were not legally made, because by vote of June 4th, 1847, sixteen assessments of five dollars each were laid by the directors; when in fact only one at a time could be included in the vote. There is no such limitation in the charter. It should be left to the judgment of the directors. 40 Maine 172 is for this view, and the better rule. The case in 22 Com. Law 130, *Stratford &c. R. R.* v. *Stratton*, has not been followed in England.

The rule in England now is that a call by instalments is valid. 4 Eng. Law and Eq. 459 and 461. Redfield on Railways, section 52.

IV. It is further objected that the act of November 13th, 1850,

R. & B. R. R. Co. *v.* Thrall.

and its acceptance by the plaintiffs, was a fundamental alteration of the.charter. If not assented to by the defendant, and if carried into operation, it would have released the defendant from his subscription. But it appears that the projected alteration was resisted by a stockholder,—that the court of chancery enjoined the plaintiffs from proceeding under the act, and that the act of incorporation and action under it have been in effect abandoned by the plaintiffs. These facts show that the defendant has not been injured by the act which passed the legislature, and that the original enterprise of the plaintiffs, for which he subscribed, remains unaltered.

5. It is also objected that the act of November 9th, 1850, authorized the railroad company to issue 5000 shares of their stock, and to guarantee a payment of an eight per cent dividend upon it. The nature of the guaranty does not appear, nor is it shown that the raising of money by this proceeding was not necessary and useful, and for purposes contemplated in the charter. The right to issue the shares existed before the act of 1850, as the stock of the company, by section 3 of the charter, could be increased to an amount needful to complete and carry on the road. It is therefore the giving of the guaranty that works injustice (if any) to the defendant. Substantially, this seems to us nothing more than a mode of raising money by pledging in some form the capital already obtained for the new amount required.

Now there is nothing in the terms of the charter, or the subscription, that forbids the pledging or mortgaging of the capital invested to secure further loans. In this form it certainly makes two classes of stockholders—one whose capital is invested without any security for profits or interest upon their money, except what the prospective success of the enterprise may afford;—the other, to whom a profit, usually higher than simple interest on their money, is guaranteed upon the amount subscribed.

Notwithstanding the evils growing out of having two classes of stockholders, with conflicting interests, we believe it has been a mode of raising money much used in this kind of enterprise, and regarded only as in the nature of a mortgage. This form of security practically, perhaps, does not make the conflict of inter-

35

ests of the different holders of securities any greater, or depreciate to any greater extent the value of the original stock, than if in the form of a loan by bond and mortgage, for those who purchase bonds secured by mortgage may also be stockholders, and thus have the same motives for managing the company for their own interests as if their debt was in the form of preferred stock.

The issue of preferred stock seems to be treated as a legitimate mode of borrowing money, and as only a form of mortgage. Ch. J. REDFIELD so regards it in his treatise on railways, p. 593.

Whether such holders of preferred stock would have any greater rights than mere mortgagees—any right as *stockholders* to act in meetings of the company, and to control and manage its affairs, is a question we are not now called upon to consider.

As to the admission of Judge Swift's deposition. It was admitted to prove, among other things, that the notices of the assessments were published in the newspapers, as required by the charter, and that the contents of these notices were such as the statute required. He states that he had examined the newspapers, and that they contained the notices, and then states the contents of the notices, but does not annex or produce the newspapers which contained them.

Were the contents of these notices, as published, material? On this point we think there can be no doubt. The charter provides that the directors, after making their assessments upon the subscribers, shall give notice thereof by publishing them, and the times and places when and where payable, in a newspaper at least thirty days previous to the time they are made payable. The subscriber, by incorporating this into his subscription, secures this notice as a condition precedent—without compliance with which he is not liable to suit. Hence proof of a publication containing notice of those facts is indispensable to maintain the suit. The newspaper which contains the notice is clearly the best evidence of its publication and contents,—the very evidence which the law and the contract provided as the proper proof to the subscriber of the calls. Its production in the first instance s required by the ordinary principles of the law of evidence.

There are many cases where notices given during the progress of a cause—notices to produce papers, and notices to quit, have been allowed to be proved by copies, and in some instances by parole evidence, without proof of notice to produce the originals. But these stand upon different grounds from notices essential to the cause of action, and upon whose contents the rights of parties depend. These, containing matters vital to the cause of action, should be proved by the best evidence ; and for the same reasons that all material facts must be so proved.

It is said that the difficulty of producing and examining in court great numbers of newspapers is a sufficient reason for an exception here. But the difficulty does not appear to us to exist. In the case at bar the production of a single newspaper containing the notice for the county where the defendant then resided, would be enough. In cases where successive notices are required, we should incline to think that the production of one paper to show the contents, and proof by parole that there were successive publications of the same notice, would be enough ; but here one publication was enough.

It is also objected that there can be no proof of loss of the original without proof of the loss of the whole edition in which the notice appeared—that this is impossible, and so where no paper could be found the party would be deprived of all proof. But the sensible and practical rule of search and inability to find an original does not require any such extreme strictness of proof. It would be sufficient, as in other cases of lost instruments, to show a fair, sincere and diligent search for the newspaper in places where it would be likely to be, within the vicinity of the party, and reasonably accessible. Application to the office of publication, if the paper is still published, or to the county clerk who keeps such files, will generally secure a copy.

The admission of the deposition to prove, in the first instance, and without proof of loss, the contents of the printed notice, we deem error.

It would seem that in Georgia the production of the newspaper has been held necessary in the first instance ; *Schley* v. *Lyon*, 6 Geo. 330, as cited in 10 U. S. Dig. 201.

In Indiana, *Unthank* v. *Henry County Turnpike Company*, 6

Porter 125, where a notice for the payment of instalments was requir ed to be published three weeks successively, proof of the publication by producing one copy of the paper, and the deposition of the publisher that the same was published the requisite number of times, was held sufficient. This seems very reasonable, for *the contents* are proved by the production of the paper, and then proof by others of due publication for the rest of the time, would be sufficient.

We have already said we deem it material that the notice should specify the place of payment. This seems to us very plain upon consideration of the reasons which doubtless led to the insertion of such a provision in the charter.

The subscribers resided in various towns in the state, from Burlington to Bellows Falls. They would naturally be in doubt as to who was the proper officer to receive payments, and where he resided, and at what place they might make payment. They might judge erroneously as to where, by implication of law, they should pay their subscriptions. To remove all uncertainty the charter provided that it should not be left to implication—that the notice should express the place of ·payment. The provision seems to us too important to be disregarded, or held as merely directory. And when the contract itself includes by reference this provision within its terms, it must be held a substantial part of the contract, and to be construed in the plain and ordinary sense in which common minds would look at it, and that is as a condition, which must be performed before the subscriber can be sued.

The authorities concur with this view. The case of *Essex Bridge Company* v. *Tuttle*, 2 Vt. 393, shows that actual notice, or notice pursuant to the charter or by-laws, should be given before·a suit can be maintained.

It is so recognized in Redfield on Railways, p. 74, and in the 22 Conn. 435. Not that it is a condition that can not be waived by the party ; on the contrary, he may by his acts treat the assessments as valid, and preclude himself from objecting to them upon such ground. It is claimed that the defendant has so waived this objection by paying the instalments—but it does not appear what instalments were paid, nor whether this defect

existed in the calls for them. It is also claimed that Mr. Linsley, as agent to collect subscriptions, called on the defendant, and he said he would pay as soon as he could, but he can not fix the time, not even whether before or after suit brought. It may have been before he paid what he has paid, and before the defect existed, or was known to exist. The alleged acts of ratification are quite wanting in those significant and positive elements which are held to estop the party from taking the objection, as will be seen by an examination of the cases in which they have been so regarded ; *Danbury and Northern R. R. Co.* v. *Wilson,* 22 Conn. 454 ; 13 Met. 311.

It has been urged in argument that this question was not passed upon by the county court, and is presented to this court for the first time. The exceptions say " the defendant asked the court to instruct the jury that there was no evidence of notice having been given of the time and place of payment of assessments." The court refused so to charge, and to the refusal the defendant excepted.

The question is clearly within the plain language of the exceptions. We can readily see how the attention of the court may have been directed to other grounds of objection—to the exclusion of Judge Swift's deposition, rather than to what was proved by it—and thus this point may not have been really presented and decided upon, though included in general terms in the request. But we deem it a fair rule in the construction of bills of exceptions to hold that where an exception appears in terms to have been taken in the county court, we must regard it as rightly before this court, unless other parts of the bill of exceptions show not only that it *may* not have been passed upon by the county court, but also, to the reasonable satisfaction of this court, that it was not. Adopting this rule of construction, we think this poin is properly before this court.

As there was no proof that the notices, as published, named any place of payment, and no such acts were shown on the part of the defendant as should estop him from objecting to this suit on this ground, we think the judgment in this respect erroneous.

As to the forfeiture.

The county court excluded this evidence, upon the ground

that without a sale of the defendant's stock the forfeiture could not operate to divest the defendant of his title to it. This we are clear is the true construction of the exceptions. The question whether notice of the resolutions of August 15th, 1849, was given to the defendant, does not appear to have been raised in the court below ; but upon the defendant's offer, the court say : " but it was not claimed that the defendant's stock had ever been sold by the corporation. Excluded."

1. The decisions which have been made, in this country and in England, upon the point when the forfeiture is perfected, vary according to the various provisions, of the general statutes, or of charters regulating the proceedings of forfeiture.

In England, the public statutes, called the Companies Clauses Consolidation Act, 8 and 9 Vict., regulate with great minuteness the proceedings upon the forfeiture of railway shares, and protect with much care the rights of shareholders.

By those statutes the corporation may, after the expiration of two months from the day of payment, declare the shares of the delinquent forfeited, but the declaration does not take effect till it has been confirmed at a general meeting of the company, held at least two months thereafter, and an order made for the sale of the forfeited shares ; and even then upon payment of the calls before sale, the shares revert to the owner. There are other regulations affecting the subject. These statutory provisions make English decisions upon this subject quite inapplicable here.

When these proceedings were had we had no general statutes on the subject. The general railroad law was adopted at the session of the legislature in October, 1849. Hence in August, 1849, when these resolutions were passed, the only provision in the statute relating to the forfeiture of shares, was the single clause in the plaintiffs' charter, sec. 17, that "the directors may require payment of sums subscribed at such times, in such proportions, and on such conditions as they shall deem best, under penalty of forfeiture of all previous payments thereon." That was all.

At an early day in railway enterprises it was claimed, that where provisions for forfeiture were embodied in the charter, the

corporation could not sue for subscriptions, but must and could enforce the payment of them only by proceedings in forfeiture. But it has long been held that the right to sue and to declare stock forfeited co-exist, and that the latter proceeding is merely cumulative. Such it was intended to be in this charter; and as the charter specifies no mode of proceeding to create a forfeiture, it is obvious that such a course of proceeding must be adopted as is reasonable and just to the stockholder.

Various suggestions have been made as to these proceedings, and their legal effect, which we will now consider.

1. We do not think that the notice of the condition upon which the stock shall be forfeited must be issued when the calls are made. That would be quite too narrow a construction of the section.

2. The votes of August 15th, 1849, do not mean that no stock shall be forfeited but that on which *all* assessments are unpaid; but rather that the shares upon which any assessments remain unpaid on the 20th September shall be forfeited.

3. The directors, long before the 15th August, had fixed the times and proportions of payments, but they had said nothing of forfeiture. There were many unpaid assessments which ought to be collected, and the stockholders on the 20th June had requested the directors to take prompt and efficient measures for their collection, and to sell shares remaining unpaid on the 1st August. On the 15th August the directors recite this vote of the stockholders, and then vote, that all stock, on which the assessments shall remain unpaid on the 20th September, " shall be and hereby *is* forfeited to the use of this corporation ;" and the treasurer was directed to give immediate notice of the vote to all delinquents ; and that all stock forfeited, by virtue of the foregoing resolutions, should be sold. We think it is quite obvious that the corporation intended that this should be the final declaration of forfeiture,—giving notice, like a decree of foreclosure, of the time when the right to redeem would be cut off. Such is the natural meaning of the language. It is not the declaration, merely, of a future intent to forfeit.

4. Is such a declaration of forfeiture reasonable ? The

declaration is made on the 15th August; it requires immediate notice of it to be given all delinquents, and it becomes absolute on the 20th September.

There is no provision in the charter as to the length of notice, no by-law of the corporation in regard to it. Our general railroad law, in authorizing the directors to sell the stock of delinquents, says " notice shall be given," but fixes no time. We think the time here given, thirty days, reasonable.

5. Must there be a sale, in order to make the forfeiture complete? There is nothing in the charter, or the by-laws of the corporation, requiring a sale. By the charter it is the neglect or refusal to pay assessments according to the calls, that makes the delinquent's stock liable to forfeiture. The penalty is a forfeiture of " all previous payments." There is no provision by which the stock may be sold, and if the avails of the sale exceed the amount of the unpaid assessment, the surplus shall be paid to the shareholder. It is an absolute forfeiture of all previous payments. In the entire absence of everything requiring or looking towards a sale, we can not say that a sale was intended by the legislature, or must be reasonably intended as necessary to divest the title of the shareholder. The Connecticut statute provides for a sale of forfeited stock, (22 Conn. 456,) and that if the avails of the sale do not pay the assessment, the stockholder is still liable for the deficiency; hence their decisions are inapplicable to this case. So the cases cited from 4 Exch. 417, and 16 Eng. L. and E. 55, turn upon the construction given to the statutes 8 and 9 Vict. c. 16 sec. 29, which provide that the company may declare a forfeiture, whether they have sued for the call or not; and the substance of those decisions is, that by their statutes " the defaulter has the right to redeem at the last moment before sale." By comparing 4 Exch. 417, *Railway Co.* v. *Kennedy*, and 3 Exch. 18, *Giles* v. *Hutt*, it will be seen how these decisions turn upon the language which regulates and authorizes forfeitures. The last cited case, in the language to be construed, approaches the very general terms of the plaintiff's charter more nearly than any other English decision we have found, and by analogy, though certainly remote, sustains the

position which the defendant here takes, that after the declaration of forfeiture in this case, the plaintiff can not sue for the assessments.

6.   It is very plain to us, that it was the intent of the legislature that the company should not declare the stock forfeited, and after that sue the stockholder.   The corporation can sue, or declare the stock forfeited, at their option, and may defer forfeiture till they have exhausted their remedy by suit.   If they sue and collect the subscription, the subscriber remains stockholder.   If they declare the stock forfeited, the stockholder loses all previous payments, and ceases to be a member of the corporation.   To make him lose his previous payments and his stock, and still be liable for the deficiency which the compulsory sale of his stock fails to pay, would be injustice, unless the charter or general law made such a rule, and the subscriber signed with knowledge of it.   The sensible construction of this charter is, if the subscriber lose his previous payments, that is the penalty, he is not bound to lose anything more.   The company are not obliged to take the stock, so long as they can get anything by suit; but when that fails, then they may take the stock of the delinquent, and he is thereby discharged from further liability.

7.   It has been much pressed upon the court that there can be no forfeiture until the company give reasonable notice to the owner that his stock will be forfeited unless by a specified time he pays the unpaid assessments; that a secret vote of directors declaring stock forfeited is wholly void.   This position is unquestionably right, and it is the duty of courts, when there is no specific provision as to notice, to see to it that the actual notice is ample.   It is urged, also, that here there is no proof that the corporation gave any notice of their vote of forfeiture to the defendant; that his offer of evidence does not propose to prove notice.

If we were satisfied that this point had been raised before the county court, and the testimony excluded on that ground, we should hold the exclusion right; but we think the fair construction of the bill of exceptions is, that the offer was rejected

because it was admitted there had been no sale of the stock declared forfeited, and that until sale there was no forfeiture.

As to the motion in arrest.

We have serious doubts whether the declaration should not have alleged that the directors issued the calls for the sixteen assessments—not the executive committee.

The charter provides that the directors shall give notice, &c.

When a charter requires the directors to do some specific act, there seems to be a stronger reason why they should be held incapable of delegating such authority, than when mere general powers are conferred on them. The charter of this, as of most corporations, authorizes the directors " to transact the general business of the company," and there is no doubt that as to the ordinary routine business of the corporation they can transact it, as most companies do, through sub-committees. The duty here specified is of a class requiring some exercise of judgment and discretion, though not, perhaps, so important, or partaking so much of the judicial function as many others ; but when the words thus expressly point to a particular duty to be performed by the directors, and not to general business or a class of duties, we think the fair intent of the law is that they should act as a body in regard to the particular matter, and not delegate their discretion or duty to a sub-committee. Doubtless they could ratify the acts of the executive committee, and so make their doings their own, as they appear to have done in this case. The declaration, if insufficient, could doubtless be amended in this particular, and as the case must go back for a new trial, we deem it sufficient to leave this point, with these suggestions in regard to it.